# In the United States Court of Federal Claims

No. 26-191
(Filed Under Seal: July 17, 2026)
Reissued: July 27, 2026*

| | |
|---|---|
| MITCHELL CONSULTING SERVICES GROUP INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| DEFENSE TESTING & EVALUATION SUPPORT SERVICES JV, LLC, | ) |
| Defendant-Intervenor. | ) |

*Gregory Steven Jacobs* and *Daniel Petkoff*, Polsinelli PC, Washington, D.C., for plaintiff. With them on the briefs was *Eyasu I. Yirdau*.

*James William Poirier*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington D.C., for defendant. With him on the briefs were *Major Bruce Nessler*, Trial Attorney, United States Army Legal Services Agency, Fort Belvoir, Virginia; and *Susan D. Denley*, Chief Attorney, 418th Contracting Support Brigade, Fort Worth, Texas.

*Amy Laderberg O'Sullivan*, *Emily Pierce Golchini*, and *Zachary H. Schroeder*, Crowell & Moring LLP, Washington, D.C., for defendant-intervenor.

* An unredacted version of this Opinion was issued under seal on July 17, 2026. *See* ECF No. 51. The Court provided the parties with the opportunity to submit proposed redactions. *See* Joint Status Report, ECF No. 53. The Court accepts all proposed redactions. The Court also corrects intervenor's name to "Defense Testing & Evaluation Support Services JV, LLC" on page two of this Opinion and further changes intervenor's shorthand name to "DTESS" for consistency purposes.

**OPINION AND ORDER**

***SMITH*, Senior Judge**

In government procurement law, contractors and federal agencies are bound by a solicitation's terms, which include regulations that impose mandatory requirements. Failure to abide by these provisions often leads to proposals being rendered ineligible and offerors excluded from competition. But what happens if a contractor raises a non-substantive requirement as means to potentially exclude a competitor from receiving an award? This post-award bid protest concerns whether an agency provided a rational basis when it undertook corrective action to change a provision in the solicitation that had the alleged effect of preserving an offeror's eligibility status.

Plaintiff Mitchell Consulting Services Group, Inc. ("Mitchell") challenges the United States Army's ("the Army") decision to implement an updated version of Federal Acquisition Regulation ("FAR") 52.204-7 as part of its corrective action. *See* 48 C.F.R. § 52.204-7. The 2018 version of that provision required offerors to be continuously registered in their System Award Management ("SAM") accounts from the time of submission of an offer through award. FAR 52.204-7 was updated in 2024 which removed the continuous registration requirement. As a result, Mitchell alleges that the Army tailored its corrective action to ensure that intervenor Defense Testing & Evaluation Support Services JV, LLC ("DTESS") received the contract after it apparently experienced a temporary lapse in its SAM registration. In a prior opinion, the Court denied the Army's motion to dismiss and found that Mitchell presented a justiciable claim. *See Mitchell Consulting Servs. Grp. Inc. v. United States*, No. 26-191, 2026 WL 1782296 (Fed. Cl. June 1, 2026). Before the Court are the parties' motions for judgment on the administrative record. ECF Nos. 34, 37, 39. For the reasons stated below, the Court **GRANTS** the Army and DTESS's motions, ECF Nos. 37, 39, and **DENIES** Mitchell's motion, ECF No. 34.

## I. BACKGROUND

### A. FAR 52.204-7 and Its History.

In 2016, the FAR Council identified inconsistencies regarding the timing of an offeror's SAM registration status. *See* Federal Acquisition Regulation: System for Award Management 81 Fed. Reg. 31896 (May 20, 2016).[1] Under FAR 52.204-7, offerors satisfied their SAM registration requirements if they completed online annual representations and certifications by the time they submitted their offer. *Id.* That differed from FAR policy that required contractors to register in SAM "by the time of award." *Id.* (citing 48 C.F.R. § 4.1102). Accordingly, the Council proposed that "offerors be registered in SAM prior to submission of an offer" which would only require contractors to update their registration "in accordance with the clause." *Id.* Doing so would also eliminate the need for offerors "to complete reps and certs multiple times when responding to solicitations." *Id.* Two years later, the FAR Council enacted a final rule that read as follows:

---

[1] Contractors use SAM's website, among other things, to submit proposals and receive payment from the government. *Contracting*, SAM.Gov, https://sam.gov/contracting, (last visited June 18, 2026). The FAR Council "assists in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government." *Federal Acquisition Regulatory Council*, Acquisition.Gov, https://www.acquisition.gov/far-council, (last visited June 1, 2026).

> (b)(1) An Offeror is required to be registered in SAM when submitting an offer or quotation, and *shall continue to be registered* until time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation.

48 C.F.R. § 52.204-7 (Oct. 2018) (emphasis added). Despite its explicit language, the FAR Council did not intend to implement a continuous registration requirement in FAR 52.204-7. Federal Acquisition Regulation: System for Award Management Registration, 83 Fed. Reg. 48691 (Sept. 26, 2018) (citing FAR 52.204-7 (Oct. 2018) (emphasis added). Instead, the new rule would clarify "the required timing of SAM registration" and would not hinder competition. *Id.* However, the Government Accountability Office ("GAO") and the Court of Federal Claims "were uniform in highlighting FAR 52.204-7(b)(1)" requires "continuous, uninterrupted, registration during the entirety of the preaward process." Federal Acquisition Regulation: Clarification of System for Award Management Preaward Registration Requirements, 89 Fed. Reg. 89472 (Nov. 12, 2024) (citing cases). As a result, contractors lost business opportunities and faced unnecessary risk for costs "and delay of protests." *Id.* Federal agencies also faced hurdles to "meet [their] mission needs with bestvalue [sic] solutions." *Id.*

In 2024, the FAR Council proposed an interim rule providing that offerors "must be registered at the time of offer submission and at time of contract award, but would not be required to be registered at every moment in between those two points." *Id.* The new rule would ensure that lapses in SAM registration that occur after submitting an offer but are corrected before award will not leave an offeror ineligible. *Id.* (noting that while "continuous, active, registration is the anticipated normal state expected of offerors and contractors," the Council intended to reduce FAR 52.204-7's effect to impose floor requirements). Indeed, contracting officers "generally verify registration status of offerors at the points of offer submission and contract award and not the time between those two points." *Id.* FAR 52.204-7's new language became final in August 2025 and provides:

> (b)(1) An Offeror is required to be registered in SAM when submitting an offer or quotation and at the time of award (see FAR clause 52.204–13, System for Award Management Maintenance, for the requirement to maintain SAM registration during performance and through final payment.

48 C.F.R. § 52.204-7(b)(1) (Nov. 2024).

**B. DTESS Experiences an Approximate 48 Hour Lapse in its SAM Registration During a Three-Year Procurement Process.**

In January 2023, the Army issued Solicitation No. W91151-23-R-0024 ("the Solicitation"). *See* Stip., ECF No. 32, at ¶ 1.[2] Over the next two months, defendant issued five amendments to the Solicitation that revised evaluation factors, incorporated questions and answers, and extended

[2] A brief recap of the substantive elements of this procurement may be found in the Court's prior opinion.

the deadline for proposals. *Id.* at ¶¶ 2–6. After receiving five offers in March 2023, the Army narrowed the field by creating a competitive range that November. *Id.* at ¶ 8–9. The competitive range included DTESS, Mitchell, and [redacted] *Id.*

From April 2024 to October 2024, the Army published five more amendments that again addressed substantive portions of the Solicitation. *Id.* at ¶¶ 7, 10–13. The procurement process culminated on October 7, 2024, when the Army awarded Mitchell Contract No. W91151-25-D-001. *Id.* at ¶ 14. A week later, DTESS filed a bid protest before GAO. *Id.* at ¶ 15. Soon after, GAO dismissed DTESS's bid protest because the Army decided to undergo corrective action. *Id.* at ¶ 16. Following its initial corrective action, the Army reopened discussions and issued four more amendments between February 2025 and November 2025. *Id.* at ¶¶ 16, 18–21. The remaining offerors then submitted their final proposals that December, and the Army awarded DTESS the contract on January 13, 2026. *Id.* at ¶¶ 22–23.

According to its records, DTESS first registered with SAM on February 15, 2023, and renewed its registration in January 2024. *See* Administrative Record ("AR"), ECF No. 46 at 9, 12, 33. In July 2024, DTESS renewed its SAM registration again which set its renewal date for July 23, 2025. *Id.* at 15. After the Army announced its initial corrective action, DTESS became entitled to costs for bringing the GAO protest. *See* Intervenor's Ex. 5, ECF No. 39-2.[3] On June 5, 2025, the Army attempted to transfer those costs to DTESS's SAM account but was "rejected due to Account Closed." Intervenor's Ex. 6. Lieutenant Colonel Matthew E. Wernert, the contracting officer at the time, then asked for DTESS's banking information to complete payment. Intervenor's Ex. 6. A week later, the Defense Finance Accounting Service ("DFAS") told Lt. Col. Wernert that DTESS "will need to update SAM to reflect a different account number then what is currently in there." Intervenor's Ex. 4. According to DFAS official Deb Boffi, "[n]ow would be a good time to update their banking, since their registration is set to expire on 7/23/25." *Id.*

Lieutenant Colonel Wernert forwarded this information to DTESS. In turn, the company renewed its SAM registration on June 18, 2025. AR at 48. But policy from the General Services Administration ("GSA") stated if "a registrant is unable to provide the old banking and/or routing number, the only approved process available is to temporarily deactivate the registration to update this banking information." AR at 51–59. Complying with GSA's procedure, DTESS deactivated its SAM account on June 22, 2025, at 1:40 PM. *Id.* at 43, 49. DTESS later reactivated its SAM account on June 24, 2025, at 6:40 PM with a new registration renewal date of July 16, 2026. *Id.* at 43, 50.

## II. PROCEDURAL HISTORY

Following the Army's award to DTESS, Mitchell filed suit on February 4, 2026, challenging, among other things, that DTESS should have been excluded from competition under FAR 52.204-7 (Oct. 2018). *See generally* Compl., ECF No. 1. Two days later, DTESS filed a

---

[3] DTESS cited to and attached extra-record evidence to its cross-motion for judgment on the administrative record. *See generally* ECF Nos. 39-1, 39-2. The Court addresses the admissibility of these exhibits in its discussion of DTESS's motion to supplement the administrative record. *See infra* section IV.A. All subsequent references to the extra-record evidence will be cited as "Intervenor's Ex." followed by the exhibit number.

motion to intervene which the Court granted. *See* Order Granting Mot. to Intervene, ECF No. 7. At an initial status conference, the parties expressed their desires to resolve this matter without further litigation. Defendant then filed four unopposed motions for an enlargement of time to facilitate settlement discussions. ECF Nos. 21, 22, 24, 25. In March 2026, Doctor Traci Leonard—the current contracting officer—notified all stakeholders that the Army would undertake the following corrective action:

a. Terminate Contract W9115126DA002 awarded under Solicitation W9115123R0024 to DTESS;

b. Issue a bridge contract to prevent a lapse of service for the requirement to the requiring activity;

c. Amend Solicitation W9115123R0024 to include the current version of FAR Clause 52.204-7, System for Award Management, codified in August 2025, which the Army failed to incorporate during the procurement process through an administrative oversight;

d. Perform a revalidation of the SAM.gov registration of all offerors in the competitive range, consistent with the amended Solicitation and the revised FAR 52.204-7 clause; and

e. Request certification and revalidate the availability of all Key Personnel in accordance with Factor 1, Mission Capability Subfactor 2, for all offerors in the competitive range.

f. Issue a new award decision.

AR at 107. Defendant then moved to dismiss this case on mootness grounds. Def.'s Mot. to Dismiss, ECF No. 26. As that motion pended before the Court, Mitchell sought to amend its complaint under RCFC 15(a). Am. Compl., ECF No. 27. The Court granted Mitchell's motion, which later filed an amended complaint that challenges the propriety of the Army's corrective action. ECF No. 31. In effect, Mitchell's amended complaint mooted defendant's motion to dismiss. Thus, the Court denied the Army's motion after evaluating the justiciability of Mitchell's new theory of relief. *See Mitchell Consulting*, 2026 WL 1782296 at *6.

The Court also adopted the parties' proposed schedule of proceedings. *See* Mar. 24, 2026, Joint Status Report, ECF No. 29; Scheduling Order, ECF No. 30. In mid-April 2026, the parties filed their joint stipulation of background facts before the Army's corrective action. *See* Stip. Mitchell then submitted its opening brief followed by defendant and DTESS's responses and cross-motions for judgment on the administrative record in May 2026. *See* Pl.'s Mot. for J. on the Administrative. R., ECF No. 34 Def.'s Resp. and Cross-Mot. for J. on the Administrative. R., ECF No. 37; Intervenor's Resp. and Cross-Mot. for J. on the Administrative. R., ECF No. 39. In early June 2026, Mitchell submitted its response to defendant and DTESS's motions and a reply in support of its own motion. Pl.'s Resp. to Cross-Mot. and Reply in Support, ECF No. 41. Briefing on the merits concluded later that month when the Army and DTESS filed their reply briefs. Def.'s

Reply Br. in Support of its Cross-Mot., ECF No. 44; Intervenor's Reply Br. in Support of its Cross-Mot., ECF No. 43.

In addition, DTESS moved to supplement the administrative record and this Court's record after attaching extra-record evidence to its opening brief. *See* Intervenor's Mot. to Suppl. the Administrative R. and/or the Court's R, ECF No. 42. The Army and Mitchell opposed its motion and filed responsive briefing. Def.'s Resp. Br. in Opp'n to Intervenor's Mot. to Suppl. the Administrative R., ECF No. 45; Pl.'s Resp. Br. in Opp'n to Intervenor's Mot. to Suppl. the Administrative R, ECF No. 49. In late June, DTESS filed its reply brief. Intervenor's Reply in Support of Mot. to Suppl. the Administrative R., ECF No. 50.

## III. LEGAL STANDARDS

### A. Scope of Review Under Bid Protest Actions.

The Tucker Act confers jurisdiction on this Court "to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with [a] procurement . . . " 28 U.S.C. § 1491(b)(1). Interested parties are "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *CS 321 East 2nd Investors, LLC v. United States*, 178 Fed. Cl. 471, 483 (2025) (citing *Percipient.AI v. United States*, 153 F.4th 1226, 1235 (Fed. Cir. 2025)). This Court may award "any relief that [it] considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

Bid protests are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). Under the APA, a court will set aside a federal agency's decision that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1329 (Fed. Cir. 2004). Agency action is arbitrary and capricious when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004). Such conduct lacks a rational basis when an agency failed to provide a "coherent and reasonable explanation of its exercise of discretion." *Id.* When challenging an award on the second ground, a plaintiff must show "a clear and prejudicial violation of applicable statutes or regulations." *Id.* Examples of arbitrary and capricious conduct include when a federal agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Courts must also find that the challenged agency action was prejudicial to the contractor to set aside agency action. *Bannum*, 404 F.3d at 1351. "The second step is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation, Inc. v. United States*,

22 F.4th 994, 997 (Fed. Cir. 2021). A protester suffers prejudice upon a showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted).

This Court will "interfere with the government procurement process only in extremely limited circumstances." *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1981). In application, the "arbitrary and capricious standard . . . is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); *see Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (requiring more than *de minimis* errors to obtain relief). Disappointed bidders bear "a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). If there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion. . . ." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). In sum, a court will not substitute its judgment for that of the agency. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

### B. Motion for Judgment on the Administrative Record.

Under Rule 52.1 of the Court of Federal Claims ("RCFC"), "a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review." *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013). Courts are required "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1356. Unlike a motion for summary judgment, genuine issues of material fact do not preclude the Court from entering judgment. *Id.* at 1355–56; *see id.* at 1356 (noting that unlike a motion under RCFC 56, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record. . . ."). Thus, courts must determine whether a party satisfied its burden of proof based on the record. *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed Cir. 2018).

### C. Permanent Injunctions.

Courts may grant injunctive relief upon a showing that "(1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favor[] the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037 (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). While injunctive relief "is based on [the] four-factor test, a plaintiff's failure to achieve success on the merits is dispositive." *Kingfisher Sys., Inc. v. United States*, 145 Fed. Cl. 22, 34 (2019) (citing *PGBA*, 389 F.3d at 1228–29; *Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 219 (2008)).

## IV. DISCUSSION

### A. Certain Exhibits Proffered by DTESS Warrant Supplementing the Administrative Record to Allow for Effective Judicial Review.

DTESS cited extra-record evidence in its opening brief that explains why it deactivated its SAM account. *See* ECF No. 39-1, 39-2. It now moves to supplement the administrative record or, in the alternative, this Court's record. ECF No. 42. Both Mitchell and the Army oppose inclusion of these proposed materials into the administrative record, though the Army did not object to admitting DTESS's evidence into the Court's record. ECF No. 45 at 1; ECF No. 47.

In bid protest actions, "the focal point for judicial review should be the administrative record *already in existence*, not some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (emphasis in original) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). However, a party may move to supplement the record to include materials "that were not considered by the agency" but "are nevertheless necessary to permit the Court's full evaluation of the agency's decision." *Can Softtech, Inc. v. United States*, No. 24-1009, 2026 WL 1288730, at *8 (Fed. Cl. Apr. 27, 2026). As a general rule, Courts limit the introduction of extra-record evidence to avoid turning APA review into *de novo* review. *Axiom*, 564 F.3d at 1380 (citing *Murakami v. United States*, 46 Fed. Cl. 731,735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). Therefore, supplementing the administrative record is appropriate when the existing record would "frustrate effective judicial review." *See id.*

While the United States Court of Appeals for the Federal Circuit has not defined what constitutes effective judicial review, this determination turns on the facts of each case. *See Naval Sys., Inc. v. United States*, 153 Fed. Cl. 166, 181 (2021). Indeed, the Court may admit new evidence "to ensure that the position of both parties is fully understood." *Id.* (quoting *FirstLine Transportation Sec., Inc. v. United States*, 116 Fed. Cl. 324, 326-27 (2014)). This includes material that allows a Court to "take a deeper dive into information that is already in the administrative record." *Id.* Put differently, a court may order defendant to supplement the record when it helps explain an agency's decision and to "otherwise correct mistakes and fill gaps in the record." *Can Softtech*, 2026 WL 1288730, at *8 (citing *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004); *Pinnacle Sols., Inc. v. United States*, 137 Fed. Cl. 118, 130 (2018)).

Supplementation of the administrative record is also proper when a party "seeks to add 'information that was generated and considered by the agency' during the procurement but was omitted from the record filed with this Court." *See Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 406 (2021) (quoting *Smith v. United States*, 114 Fed. Cl. 691, 695 (2014)); *see also Can Softtech*, 2026 WL 1288730, at *8 (allowing supplementation for information "that by its very nature would not be found in the agency record."). "The party seeking to supplement the administrative record bears the burden of demonstrating why the existing record is insufficient." *Price Gordon Servs. v. United States*, 139 Fed. Cl. 27, 50 (2018).

Alternatively, the Court may supplement its own record, which includes admitting evidence addressing prejudice or prospective relief. *See East West, Inc. v. United States*, 100 Fed. Cl. 53, 57–58 (2011); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366–67 (2009) (allowing

supplementation of the Court's record for other injunctive relief factors). Evidence admitted into the Court's record need not have appeared before the agency decision-maker and may include materials created after the challenged action occurred. *See PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1, 5 (2009); *Insight Pub.*, 157 Fed. Cl. at 415. "Supplementation of the Court record is not appropriate where the materials sought to be admitted address the substance of the protest. . ." *Voith Hydro, Inc. v. United States*, 142 Fed. Cl. 233, 239 (2019) (citations omitted).

DTESS seeks to admit eight exhibits and a declaration from [redacted], who helped the company update its banking information in SAM, to the administrative record. *See* Intervenor's Mot. to Suppl. the Administrative R., ECF No. 42. Some exhibits include copies of materials that already appear in the record confirming DTESS's SAM registration from previous years. *Compare* Intervenor's Exs. 1–3, 8; *with* AR at 9, 12, 15, 22–23. Those proposed exhibits do not support supplementing the administrative record. *See Linc Gov't Servs., LLC v. United States*, 95 Fed. Cl. 155, 159 (2010) (declining to supplement the administrative record with duplicative evidence within the record). DTESS also attached its SAM registration email from June 24, 2025, but that information already appears in the record as well. *Compare* Intervenor's Ex. 7; *with* AR at 18. [redacted] testimony summarizes information gleaned from DTESS's exhibits, which will not aid this Court's review function either. *See* [redacted] Aff., ECF No. 39-1. Therefore, the Court denies DTESS's request to supplement the administrative record for the above materials.

However, the Court will consider Exhibits 4, 5, and 6 that are attached to DTESS's motion. Exhibits 4 and 6 depict email correspondence between DTESS, Lt. Col. Wernert, and DFAS. *See* Intervenor's Exs. 4, 6. The email threads illustrate the circumstances that caused DTESS's temporary deactivation of its SAM registration and how the Army directed DTESS to update its banking information for reimbursement costs. *Id.* Those two exhibits contextualize Dr. Leonard's rationale that DTESS's deactivation occurred through no fault of its own. *See* AR at 107. Exhibits 4 and 6 could also help analyze Dr. Leonard's other reasons for initiating corrective action. *Id.* Additionally, Exhibit 5 documents that the Army owed DTESS costs for undertaking corrective action after GAO dismissed its initial bid protest. Intervenor's Ex. 5. This Exhibit again helps corroborate why DTESS updated its banking information, a necessary context for the Court to consider when determining if the Army's actions were arbitrary and capricious. *Id.* In sum, admitting Exhibits 4, 5, and 6 will allow the Court to perform effective judicial review. *Axiom*, 564 F.3d at 1380.

By contrast, defendant argues that the Court "must decide whether [Dr. Leonard] abused her discretion" when resolving the ambiguity of DTESS's SAM registration status. ECF No. 45 at 5. Since Dr. Leonard stated her rationale and used another declaration that highlighted uncertainties regarding DTESS's SAM registration, the proposed materials are unnecessary. *Id.* at 3–4. Like the Army, Mitchell asserts that DTESS's extra-record evidence addresses an irrelevant issue: that DTESS was ineligible during award. ECF No. 49 at 4–5. Mitchell also contends that Dr. Leonard did not rely on these materials when she announced corrective action. *Id.* at 5–6. These arguments fail to persuade.

As previously explained, the Court agrees with DTESS that consideration of Exhibits 4, 5, and 6 may provide effective judicial review by "fill[ing] gaps in the record." *Can Softtech*, 2026

WL 1288730, at *8. Introducing these materials allows the Court to take "a deeper dive into" Dr. Leonard's rationale for corrective action, or "information that is already in the administrative record." *Naval Sys.*, 153 Fed. Cl. at 181. The proposed exhibits may further assist the Court in determining whether the Army's corrective action promoted fairness and competition over conforming the Solicitation to a single offeror—another issue in dispute. ECF No. 39 at 20–23. These topics all relate to the ultimate question in this protest: whether the Army's corrective action lacked a rational basis. *See AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018).[4] Since DTESS's exhibits address the Army's justifications for its corrective action, or the substance of this protest, the Court finds it unnecessary to include those materials as part of its own record. *Voith Hydro*, 142 Fed. Cl. at 239.

Therefore, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** DTESS's motion to supplement the administrative record, ECF No. 42. The Court will consider Exhibits 4, 5, and 6 for the reasons stated above.

### B. The Contracting Officer Had Discretion to Update FAR 52.204-7 and DTESS's SAM Registration Status Is Ambiguous for Purposes of This Protest.

At the outset, Mitchell alleges that regulations did not require the Army to update the Solicitation because the FAR Council enacted FAR 52.204-7 (Nov. 2024) after this procurement began. ECF No. 34 at 7–8; ECF No. 41 at 8–9. Meanwhile, DTESS argues that whether the Army "was obligated to include the clause is *irrelevant*. The question for the Court is whether the Agency had *discretion* to do so . . ." ECF No. 39 at 14 (emphasis in original). Mitchell later concedes that updating FAR 52.204-7 "was [] discretionary, not mandatory," but nonetheless argues that the Army abused its discretion. ECF No. 41 at 8.

Indeed, updates to FAR provisions "apply to solicitations issued on or after the effective date of the change." 48 C.F.R. § 1.108(d)(1). But contracting officers, "at their discretion," may include updated provisions "in a solicitation issued before the effective date" if an award of a resulting contract occurs on or after the effective date. 48 C.F.R. § 1.108(d)(2). This Court has defined a resulting contract as one that will "happen as a consequence." *Zolon PCS II, LLC v. United States*, 176 Fed. Cl. 279, 289 (2025) (*Zolon II*) (citations and quotations omitted). Since FAR 52.204-7 (Nov. 2024) became effective well after the Army issued the Solicitation, it does not retroactively apply on its own. *See* Stip. at ¶ 1; 89 Fed. Reg. 89487. However, the Army's new award, or resulting contract, from its corrective action grants it discretion to update FAR 52.204-7. *See* FAR 1.108(d)(2); *Zolon II*, 176 Fed. Cl. at 289.

Next, both contractors assert that the Court need not address whether DTESS's SAM registration lapsed. ECF No. 39 at 12; ECF No. 41 at 4. But according to the Army, "[t]here is room to argue that the DTESS registration remained in force even" though it experienced a temporary deactivation of its SAM account. ECF No. 37 at 24. Defendant also claims that DTESS remained continuously registered because "the 'active' flag on the SAM website was only a peripheral aspect of 'registration.'" *Id.* DTESS also believes that courts should evaluate an

[4] While the Court does not consider DTESS's exhibits for this purpose, the Court disagrees that its eligibility is not at issue. Indeed, the Army and DTESS both argue that its SAM registration never lapsed. ECF No. 37 at 24; ECF No. 39 at 20–21.

offeror's SAM registration status from when they submit a final revised offer, not an initial proposal. ECF No. 39 at 20–21.[5] These arguments place DTESS's eligibility status at issue and invites the Court to address each position.

To be registered in SAM, FAR 52.204-7 provides, among other things, that "[t]he Government has marked [a contractor's] record 'Active.'" 48 C.F.R. § 52.204-7(a)(4). Applying this definition to FAR 52.204-7(b)(1) could support a finding that a contractor's SAM account must be continuously active to be continuously registered. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) ("[I]dentical words used in different parts of the same act are intended to have the same meaning."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 180 (2012) (reading that text "should be interpreted in a way that renders them compatible, not contradictory.").[6] Although FAR 52.204-7 is "silent regarding whether [the Army] must continuously report an account as active," principles of statutory interpretation point towards this result. ECF No. 37 at 27. In opposition, the Army alleges that Mitchell confuses registration with active status. *Id.* at 24. Based on FAR's definition of registered, "disrupted physical access to registration information . . . [does not] mean that the registration is extinguished." *Id.* at 25. Those arguments do not address what being "marked" active means, including whether it must be continuous. The Army also proposes that GSA's information technology protocol "was inconsistent with the FAR Council's intent and expectations." *Id.* But this Court is bound by the plain text of FAR, not the Council's interpretation. *See Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1300 (Fed. Cir. 2008).[7] Given this protest's scope, the Court declines to definitively answer whether DTESS's SAM registration lapsed. However, the Court does reject the Army's argument that DTESS's registration definitively remained intact.

Instead, the Court agrees that DTESS's SAM registration status remains ambiguous. As further proof, GSA Program Manager Marci Eaton testified that deactivating a SAM account "maintains the same Unique Entity Identifier (UEI) and CAGE code but wipes the remainder of the SAM.gov registration data." AR at 49.[8] Ms. Eaton, a "subject matter expert for all aspects of record collecting pertaining to SAM.gov," did not equate this data wipe to a lapse in registration. *Id.* at 48–50. SAM further defines an entity's "Initial Registration Date" as when the "entity registration was submitted" and one that "will not change." *Id.* at 84. Still, DTESS's own records show two "versions" of its SAM profile and a subsequent registration date of June 22, 2025. *Id.*

---

[5] DTESS remained registered from December 4, 2025, to January 13, 2026. Under this scenario, even if the Court concluded that the Army arbitrarily and capriciously engaged in corrective action, such conduct would not be prejudicial to Mitchell if DTESS's registration never lapsed under that time period. *Bannum*, 404 F.3d at 1351.

[6] FAR 52.204-7(a) lists the requirements for SAM registration as a conjunctive list. By using the word "and" all criteria must be met for a contractor to be considered registered. Scalia & Garner, *supra*, at 116.

[7] The Army also notes that the FAR Council updated the language in FAR 4.1103(a)(1) in 2018 "to specify that offerors must have status designation of 'active' in SAM at the time of offer or quotation submission, to distinguish active from inactive registrants in SAM." ECF No. 37 at 33 (quoting 83 Fed. Reg. at 48692–93). The Court reviewed that subsection, which also addresses SAM registration, but could not find the word "active" implemented into subsection (a)(1). Thus, the Army again relies on the FAR Council's interpretation when this Court must adhere to the plain text of unambiguous regulatory language.

[8] CAGE codes and UEIs are both alpha-numeric sequences specifically assigned to individual SAM accounts. AR at 71, 97.

at 2. One government official opined that DTESS may have started its SAM registration in 2023 "but didn't have an active SAM entity record until June 2025." *Id.* at 2. SAM also monitors an entity's registration status with "Active" and "Inactive" designations, which further clouds how the Court should construe FAR 52.204-7(a)(4). *Id.* at 93–94. Therefore, the Court leaves this issue for a later Court to decide.

DTESS later argues that that the Court should evaluate its status based on its final revised offer. ECF No. 39 at 20–21; ECF No. 43 at 12–14. If the Court examined its registration status from December 2025 to January 2026, then DTESS did not violate FAR 52.204-7 (Oct. 2018). To support its position, DTESS relies on this Court's decision in *Hanford Tank Disposition All., LLC v. United States*, 173 Fed. Cl. 269 (2024). That case "involved a situation where the validity of the initial offer had expired and been replaced by a new offer" with substantive differences. *Id.* at 312, 316. In the Court's opinion, defendant "could no longer evaluate the earlier submitted proposals," meaning subsequent proposals qualified as independent offers. *Id.* at 313–15; *see* FAR 2.101 (defining offer as "a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract."). Under that logic, the Court held that final revised offers "are the proposals for an agency to properly consider" under FAR 52.204-7. *Hanford*, 173 Fed. Cl. at 315.

However, the Court in *Zolon PCS II, LLC v. United States*, 172 Fed. Cl. 742 (2024) (*Zolon I*) reached a different conclusion. After undertaking a textual analysis, the Court noted that the indefinite article "an" preceded "offer" in FAR 52.204-7(b)(1). *Id.* at 752. According to *Zolon I*, this grammatical construction "comports with the expectation that a single offeror may submit multiple offers over the course of a procurement." *Id.* at 752–53. Therefore, the relevant "trigger" date for an offeror's SAM registration status is the date an offeror submitted their *initial* proposal. *Id.* at 753–54. *Zolon I* aligns with other precedent holding that an offeror violated FAR 52.204-7(b)(1) despite submitting revised offers. *Id.* at 753 (citing *Thalle/Nicholson Joint Venture v. United States*, 164 Fed. Cl. 224, 229–30, 233–34 (2023); *Indep. Rough Terrain Ctr., LLC v. United States*, 172 Fed. Cl. 250, 254, 260–61 (2024)).

After careful consideration, the Court concludes that *Zolon I* provides a more practical interpretation of the relevant timeframe for an offeror's SAM registration status. During this procurement, the Army amended its Solicitation 14 times and re-opened discussions following its initial corrective action. Stip. at ¶¶ 2–6, 7, 10–13, 18–21. Four of those amendments occurred after FAR 52.204-7 (Nov. 2024) was enacted and before Mitchell and DTESS submitted their final *revised* proposals in December 2025. *Id.* at ¶¶ 18–21. Although the Court cannot examine the differences between those proposals, both submissions arose from their *original* offers. *Zolon I* noted that FAR 52.204-7 advises offerors "who are not registered in SAM should consider applying for registration immediately upon receipt of the solicitation." *Zolon I*, 172 Fed. Cl. at 753 (citing 48 C.F.R. § 52.204-7(d)). It would seem impractical, then, that an offeror's SAM registration requirements reset each time it submits a revised offer. Doing so would "allow bidders to avoid registering in SAM until the final stages of the procurement process." *Zolon I*, 172 Fed. Cl. at 753. In this case, the Court must evaluate DTESS's SAM registration status starting from January 2023, not December 2025.

Therefore, the Court concludes that the Army retained authority to amend the Solicitation, and DTESS's SAM registration status will proceed as unambiguous.

**C. A Rational Basis Exists for the Army's Corrective Action.**

Mitchell posits that the Army designed its corrective action solely for the benefit of DTESS. ECF No. 34 at 6. According to Mitchell, upholding this corrective action would grant agencies with unfettered discretion and undermine government procurement law. ECF No. 41 at 1, 8. In response, the Army asserts that its corrective action promotes fair competition and that Mitchell tiptoes around asserting a claim based on bad faith. ECF No. 37 at 19–25. DTESS also adds that FAR 52.204-7's regulatory history supports the Army's corrective action. ECF No. 39 at 15–20.

In general, federal agencies retain "broad discretion to take necessary corrective action where there has been an error in the procurement process." *Pro. Serv. Indus., Inc. v. United States*, 129 Fed. Cl. 190, 193 (2016) (citations and quotations omitted). An agency's corrective action will "be sustained if 'rationally justified' by the grounds relied on to take corrective action." *Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 654–55 (2023) (citing *Raytheon Co. v. United States*, 809 F.3d 590, 595 (Fed. Cir. 2015); *Croman Corp. v. United States*, 724 F.3d 1357, 1367 (Fed. Cir. 2013)). In other words, corrective action must be "reasonable under the circumstances." *Id.* (citing *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 510–11 (2021). During a negotiated procurement, agencies may amend a solicitation "when it determines that such action is necessary to ensure fair and impartial competition and to permit the government to obtain its minimum requirements at the most favorable price." *ManTech Telecommunications & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 73 (2001), *aff'd*, 30 F.App'x 995 (Fed. Cir. 2002).

When determining if an agency offered a rational basis, a "court may uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned" from the record. *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998); *Harrington v. Dep't of Veterans Affs.*, No. 2023-1722, 2025 WL 655546, at *3 (Fed. Cir. Feb. 28, 2025) (reinforcing that perfect explanations are not required). In some instances, federal agencies may undergo corrective action "when a reasonable question arises, even if it does not necessarily have specific evidence of a specific problem or a specific plan for fixing it." *Metrostar Sys., LLC v. United States*, 180 Fed. Cl. 708, 720 (2026) (citing *Bear Mountainside Realty LLC v. United States*, 168 Fed. Cl. 179, 200 (2023), *aff'd*, No. 2024-1245, 2025 WL 2318317 (Fed. Cir. Aug. 12, 2025)).

To resolve this matter, both *Zolon I* and *II* are instructive. In *Zolon I*, defendant announced corrective action after three offerors experienced lapses in their SAM registrations and noted that "it would ensure that all awardees have complied with FAR 52.204-7(b)(1) [(Oct. 2018)]." *Zolon I*, 172 Fed. Cl. at 749. To achieve this result, defendant approved "an individual deviation" from FAR 52.204-7 that required offerors to be registered in SAM "when (i) submitting an offer or quotation, (ii) at the time of award, and (iii) during performance, and through final payment." *Id.* The Court held that defendant's deviation was arbitrary and capricious because it sought to avoid imposing FAR 52.204-7's continuous registration requirement. *Id.* at 754. While defendant intended to promote fair competition and to "make best value contract awards," it failed to establish that competition "would be significantly narrowed absent the deviation." *Id.* at 755–56. Allowing

this deviation would also enable defendant to usurp FAR requirements "whenever a requirement operates to exclude a putative awardee." *Id.* at 757.

A year later, the Court reached a different conclusion in the same case. *See Zolon II*, 176 Fed. Cl. at 295–96. There, defendant replaced FAR 52-204-7 (Oct. 2018) with its 2024 counterpart through an amendment to the solicitation. *Id.* at 284–85. Implementing FAR 52.204-7's new language occurred while the agency performed corrective action on other elements of the solicitation. *Id.* Defendant justified its decision in a memorandum explaining that FAR 52.204-7 (Nov. 2024) "carries out the NGA's original intent for SAM registration because the NGA had not interpreted the 2018 rule to require continuous registration." *Id.* at 285. Enforcing this change would allow defendant to award contracts based on stated evaluation criteria instead of leaving offerors ineligible for "an administrative issue that has absolutely no practical impact on the Government." *Id.* These reasons, which matched the FAR Council's rationale toward updating FAR 52.204-7, established a rational basis to uphold the amendment. *Id.* at 294.

**1. The Record Demonstrates that the Army's Corrective Action was Reasonable and was Not Made to Conform the Solicitation to a Single Offeror's Proposal.**

The Army seeks to amend the Solicitation through corrective action to add FAR 52.204-7 (Nov. 2024) like *Zolon II.* But its actions appear somewhat triggered by DTESS's eligibility status which runs analogous to *Zolon I.* While this Court must evaluate the reasonableness of defendant's actions, policy considerations become relevant. On one hand, it seems unfair to exclude an offeror for "an administrative issue that has absolutely no practical impact on the Government." *Id.* at 285. On the other hand, contractors bind themselves to a solicitation's terms, and rewarding non-compliant offerors could introduce its own unfairness. After evaluating the administrative record, the Court holds that the Army properly exercised its discretion.

In her notice letter, Dr. Leonard attributed the Army's failure to update FAR 52.204-7 (Oct. 2018) to "an administrative oversight" without further explanation. AR at 107. However, this justification of "less than ideal clarity" does not leave the Army without a rational basis. *Ceramica*, 810 F.2d at 1139. Over three years, the Army amended the Solicitation 14 times which largely revised substantive aspects of the Solicitation. *See* Stip. at ¶¶ 2–7, 10–13, 18–21. For instance, a February 2025 amendment updated sections of the Solicitation and incorporated "additional Task Authorization Requests." *Id.* at ¶ 18. Another amendment issued in November 2025 "updated Instructions to Offerors, provided updated wage determinations, and addressed all questions and concerns provided by offerors." *Id.* at ¶ 19. These changes addressed topics related to the evaluation of proposals, not a provision "that has absolutely no practical impact on the Government." *See Zolon II*, 176 Fed. Cl. at 285. The FAR Council has also commented that contracting officers do not check an offeror's SAM registration status at every moment. *See* 89 Fed. Reg. 89472. When evaluating this prolonged procurement, it was reasonable that the Army overlooked updating FAR 52.204-7 (Oct. 2018).

This rational basis also finds support when examining DTESS's purported lapse in its SAM registration. After GAO dismissed DTESS's initial bid protest, Lt. Col. Wernert notified DTESS that its "electronic funds transfer was rejected due to 'Account Closed.'" Intervenor's Ex. 6. Following a failed attempt to enter new banking information, Ms. Boffi wrote to Lt. Col. Wernert

that DTESS "will need to update SAM to reflect a different account number than what is currently in there . . . Now would be a good time to update their banking, since their registration is set to expire on 7/23/25." Intervenor's Ex. 4. Lieutenant Colonel Wernert forwarded DFAS's email to DTESS who then complied by deactivating its account to update its information. *See id.* Based on these interactions, the Army was not concerned with an offeror's SAM registration status or what corresponding FAR provision governed that determination. Instead, it sought to transmit costs owed to DTESS and to move ahead with its procurement. ECF Intervenor's Ex. 5. Therefore, the Army's decision to update FAR 52.204-7 due to an administrative oversight was neither arbitrary nor capricious.

Dr. Leonard also concluded that DTESS, "through no fault of their own, followed the only approved process that the Government had available to update their banking information in SAM.gov." AR at 107. Since DTESS lacked the requisite banking information, it could only complete Lt. Col. Wernert's instructions by deactivating its SAM account which allegedly caused a lapse in its SAM registration. *Id.* at 55. In effect, the Army directed DTESS to purportedly become ineligible for award. Mitchell blames DTESS for its alleged lapse because it "failed to adequately maintain its banking records and therefore deactivated its SAM profile." ECF No. 34 at 11. While that may be true, the Court declines to adopt Mitchell's skepticism toward DTESS's ambiguous registration status. Even though there is "no universal test as to what constitutes appropriate corrective action . . . reasons unrelated to a defect in a solicitation" may suffice to uphold such action. *Hesco Bastion Ltd. v. United States*, 136 Fed. Cl. 146, 154 (2018) (quoting *WHR Grp., Inc. v. United States*, 115 Fed. Cl. 386, 395–96 (2014)). Along those lines, contracting officers may undertake corrective action "where the agency determines that such action is necessary to ensure fair and impartial competition." *ManTech*, 49 Fed. Cl. at 73.

In this case, precluding corrective action where an agency caused an offeror's non-compliance with a solicitation does not promote competition. Forcing offerors like DTESS to wait until the end of a procurement to receive costs that could be paid immediately also creates commercially infeasible consequences. Again, Mitchell relies on a non-substantive and inconsequential provision in this negotiated procurement. *See Garrett*,163 Fed. Cl. at 654–55 (upholding additional corrective action when an offeror's bid failed for a "clerical error" which would have rendered the proposal ineligible for award). As this Court's caselaw holds, agencies are afforded discretion to fix errors in the procurement process and to improve competition. *PDS Consultants, Inc. v. United States*, 170 Fed. Cl. 107, 118 (2024) (citing *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 986 n. 1 (Fed. Cir. 2018)).[9] DTESS points out that [redacted]—the other contractor in the competitive range—may have an ambiguity regarding its SAM registration status. AR at 3. That means if both offerors were ineligible for award, Mitchell would prevail as the only eligible contractor. To maintain fairness, deference seems appropriate to allow agencies who recognize unfair circumstances to avoid narrowing competition. *See Zolon II*, 176 Fed. Cl. at 285. Therefore, the Court finds Dr. Leonard's rationale that any perceived ambiguity as to DTESS's eligibility was not its fault as sufficient to update the Solicitation with FAR 52.204-7 (Nov. 2024).

---

[9] The Court does not see why this principle of using corrective action to fix perceived errors should not extend to when an agency causes an offeror to allegedly become non-compliant and when their actions were motivated to promote competition.

Mitchell further asserts that the Army's decision "is arbitrary and capricious because its sole purpose is to reverse the ineligibility of a single offeror." ECF No. 34 at 6. According to Mitchell, salvaging an ineligible proposal "is not a rational basis for taking corrective action." *Id.* at 7. By contrast, defendant seems to imply from Dr. Leonard's letter that the Army did so to promote fair competition. ECF No. 37 at 19–21. While Dr. Leonard did not expressly communicate her intention to promote fair competition, the Court can discern this rationale from the record. *Ceramica*, 810 F.2d at 1139. The parties center their arguments on this issue around the Court's decision in *Pro. Serv.* In that case, a federal agency "materially changed the duties and qualifications of" a key personnel position following multiple awards to a contractor who failed to meet the minimum qualifications for that position. *Pro. Serv.*, 129 Fed. Cl. at 195–200. *Pro. Serv.* found no rational basis existed and concluded that the agency failed to "examine its needs and engaged in reasoned decision-making when it amended the requirements of its solicitation." *Id.* at 206. Indeed, nothing in the record could assist the Court in determining "how the decision was made or what rationale supports it." *Id.* at 204. Upon review, the agency's proposed changes had "the *effect* of conforming the solicitation precisely to the experience and qualifications of" the putative awardee. *Id.* (emphasis added).

Under *Pro. Serv.*, Mitchell accuses the Army of "changing the Solicitation to conform to DTESS's proposal." ECF No. 34 at 10; *see also* ECF No. 41 at 2. However, the Court agrees with defendant and DTESS's interpretation of that case. As explained in a later opinion, the Court "was unable to find . . . that the agency's decision to modify certain technical requirements and issue a new solicitation was based on an assessment of *the agency's actual needs*." ECF No. 43 at 10 (citing *Hesco*, 136 Fed. Cl. at 155–56) (emphasis added). *Pro. Serv.* does not stand for a *per se* rule that the appearance of conforming a solicitation to an offeror invalidates corrective action. ECF No. 44 at 6–9. Furthermore, "the possibility that the agency sought to favor a single offeror" was one of many inferences in determining that "the administrative record did not imply the necessary determination of agency needs." *Id.* at 8.

Under these circumstances, the record demonstrates that defendant seeks to increase competition and the pool of offerors. Other courts have upheld agency action that accomplishes this same result. *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 225 (2005), *aff'd*, 163 F. App'x 892 (Fed. Cir. 2006) (amending solicitation when seven out of eight offers failed to comply with its terms); *Bae Sys. Norfolk Ship Repair, Inc. v. United States*, 163 Fed. Cl. 217, 238 (2022) (cancelling solicitation when evidence showed another offeror elected not to bid due to a requirement); *Garrett*,163 Fed. Cl. at 654–55; *Zolon II*, 176 Fed. Cl. at 295–96.

Through corrective action, certain contractors may benefit, perhaps to the detriment of others. But again, procurement officials "have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *ManTech*, 49 Fed. Cl. at 73. Similar to *EP Prods.*, expanding and ensuring all competitive offerors may fairly compete in this procurement acts as a rational basis. *See* 63 Fed. Cl. at 225. Shrinking the competitive pool to potentially one offeror based on administrative clerical requirements diminishes a contracting officer's discretion. It would also prevent agencies from selecting proposals of the best value as opposed to the *only* value. *See Bae Sys.*, 163 Fed. Cl. at 238. And while federal agencies need not admit an error occurred before taking corrective action, the record demonstrates that the Army intended to promote competition so it could meet

its needs. *ManTech*, 49 Fed. Cl. at 73. Here, the Court is not rubber-stamping an unexplained procurement decision that lacks a rational basis. *See Pro. Serv.*, 129 Fed. Cl. at 206.

Mitchell next contends that *Zolon II* differs from this case because incorporating FAR 52.204-7 (Nov. 2024) into that solicitation came as part of a broader corrective action. ECF No. 41 at 11–13 (citing *Zolon II*, 176 Fed. Cl. 284). These distinguishing facts do not influence the Court's decision. Mitchell failed to consider that *Zolon II* concluded that "awards to the best-value offerors based on the criteria in the Solicitation is the best way to meet [an agency's] needs." *Zolon II*, 176 Fed. Cl. at 295. "Conversely, eliminating offerors for 'an administrative issue that has absolutely no impact on the Government' does not . . . help meet its needs." *Id.* While defendant in *Zolon I* attempted to sidestep its obligations under FAR, the Army intends to apply FAR's current requirements. *Zolon I*, 172 Fed. Cl. at 756. By implementing FAR 52.204-7 (Nov. 2024), the Army will avoid the very problem that caused the FAR Council to update its regulation. 89 Fed. Reg. 89472.

In anticipation of this result, Mitchell makes a series of existential claims that the Court's holding would bear on government contracting. If the Court sides with DTESS, "agencies will have the green light going forward to respond to bid protests of an awardee's eligibility by changing the ground rules to make them eligible." ECF No. 41 at 1. In this Court's opinion, the absence of a "limiting principle" that Mitchell fears will disappear seems overblown. *Zolon I* discussed that limiting principle when an agency attempted to circumvent FAR, not to incorporate a current provision. *See Zolon I*, 172 Fed. Cl. at 757. Today's holding does not grant agencies a license to alter solicitations without any restriction. Instead, the Court reinforces a well-settled principle that federal agencies retain broad discretion to undertake corrective action "when it determines that such action is necessary to obtaining the best value contract awards." *Zolon II*, 176 Fed. Cl. at 293 (quoting *ManTech*, 49 Fed. Cl. at 73). In fact, adopting Mitchell's interpretation of arbitrary corrective action would promote anti-competitive results and limit consideration of technically acceptable bids. Should an agency exceed its bounds, protestors like Mitchell are free to file suit before this Court or at GAO. Despite Mitchell's worries about the procurement system, the sky is not falling.

The Court acknowledges Mitchell's broad statement that all offerors should be held "to the same Solicitation ground rules." ECF No. 41 at 2. However, it questions how sincere those sentiments are. During this protest, Mitchell acts as if FAR 52.204-7 (Oct. 2018) entitles it to disqualify other competitors. But as discussed in *Zolon II*, protestors like Mitchell do not maintain a "vested right" under certain FAR provisions "because of an alleged right acquired under the prior rule or because of the prior rule's incorporation in the original RFP." *Zolon II*, 176 Fed. Cl. at 293. FAR 52.204-7 (Nov. 2024) "does not impair [Mitchell's] vested rights, create any new obligation, impose any new duty, or attach any new disability" either. *Id.* Instead, the Army's corrective action takes the only bullet out of Mitchell's chamber. That bullet sought to eliminate a competitor for reasons unrelated to its offer or the procurement at-large. Replacing FAR 52.204-7 (Oct. 2018) with its 2024 successor levels the playing field and allows the Army to meet its needs by considering all offers from its competitive range. Thus, while Mitchell's protest appears to advance righteous intentions it instead attempts to undermine an award through gamesmanship. That not only lacks concern for the state of government contracting, but it "is [also] bad procurement policy." ECF No. 41 at 1.

Therefore, the Court holds that the Army maintained a rational basis to update FAR 52.204-7 through corrective action such that its conduct was not arbitrary and capricious.

**2. No "Irrefragable Proof" Exists to Support a Claim of Bad Faith.**

As an aside, Mitchell disclaimed that it "is not alleging that the Army acted in bad faith." ECF No. 41 at 4. Still, DTESS cautions that Mitchell's protest in substance makes bad faith allegations and avoids asserting such a claim by massaging the language in its briefing. ECF No. 43 at 3–7 (citing cases and summarizing Mitchell's representations that purportedly establish this claim).

There is a "strong presumption that government contract officials exercise their duties in good faith." *Bae Sys.*, 163 Fed. Cl. at 238. To rebut that presumption, protestors must show "well-nigh irrefragable proof that the government officials did not act in good faith." *Id.* (quotations omitted) (citing *Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013)). Protestors challenging agency conduct that purportedly tailors itself to benefit a single offeror must typically establish that the government acted in bad faith. *Zolon I*, 172 Fed. Cl. at 755 (citing *EP Prods.*, 63 Fed. Cl. at 225–26). Some courts will treat a protestor's claim as one alleging bad faith even if the contractor does not use the magic words. *See Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 130 (2010) ("Curiously, perhaps in an attempt to evade the stringent standard of proof, plaintiff assiduously avoids using the words 'bad faith' except when arguing that bad faith is 'not essential to establish that a cancellation was a pretext.'"); *PAE Applied Techs.*, 154 Fed. Cl. at 523–24. Regardless, claims of bad faith are subject to the clear and convincing evidence standard. *Bae Sys.*, 163 Fed. Cl. at 238.

The Court notes that Mitchell presented no evidence that the Army acted in bad faith in its briefing. On its own review, the Court cannot find clear and convincing, or "well-nigh irrefragable proof," that the Army used its corrective action as a pretext to award DTESS the contract.[10] Therefore, the Court concludes that Mitchell cannot prevail on a bad faith theory.

**D. Mitchell Cannot Prevail on the Merits, and the Court Hereby Declines to Impose a Permanent Injunction on Its Behalf.**

A protestor "that has not actually succeeded on the merits of its claim cannot prevail on its motion for injunctive relief." *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 176 (2004) (citing *Nat'l Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004); *Int'l Resource Recovery, Inc. v. United States*, 65 Fed. Cl. 150, 164 (2005)). Since Mitchell failed to show that it will succeed on the merits, the Court need not address the other injunctive relief factors. Therefore, the Court holds that granting Mitchell injunctive relief in this case would be inappropriate.

---

[10] Indeed, Mitchell originally won the contract under this procurement. Stip. at ¶ 14. The Army will also request certification and revalidate the availability of key personnel for certain sub-factors for each offeror and then make a *new* award. AR at 107.

## V. CONCLUSION

For the forgoing reasons, the Court hereby **DENIES** Mitchell's motion for judgment on the administrative record, ECF No. 34, and **GRANTS** the Army and DTESS's motions for judgment on the administrative record, ECF Nos. 37, 39. The Clerk of the Court is ordered to **ENTER JUDGMENT** in favor of the Army and DTESS consistent with this Order. The parties are directed to **FILE** a joint status report on or before **July 31, 2026**, that proposes redactions to this Opinion to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge